Manhattan Land and Fruit Company v. Commissioner.
Manhattan Land & Fruit Co. v. Commissioner
Docket No. 108420.
United States Tax Court
1942 Tax Ct. Memo LEXIS 44; 1 T.C.M. (CCH) 217; T.C.M. (RIA) 42649; December 11, 1942
*44 John F. Condon, Jr., Esq., 52 Wall St., New York City, and Jack M. Evans, Esq., for the petitioner. Clay C. Holmes, Esq., and Ralph H. Dwan, Esq., for the respondent. SMITH Memorandum Opinion SMITH, J.: This is a proceeding for the redetermination of deficiencies in income tax for the calendar years 1938 and 1939 in the respective amounts of $425.31 and $2,600.50. The question in issue is whether certain litigation expenses incurred and paid by the petitioner in 1938 and 1939 are deductible as "ordinary and necessary" expenses in computing petitioner's taxable income or constitute taxable expenditures which represent additional cost of the property. [The Facts] The facts are shown by the pleadings and agreed statement of facts with exhibits attached thereto, supplemented by the testimony of one witness. We find the facts as stated in the petition and admitted in the answer and as incorporated in the agreed statement of facts. The facts are summarized as follows: 1. The petitioner is a corporation organized and existing under and by virtue of the laws of the State of New York with its principal place of business at 52 Wall Street, New York City. It filed its income tax returns *45 for the years 1938 and 1939 with the collector of internal revenue for the second district of New York. 2. Prior to 1900 the petitioner acquired certain lands in Plaquemines Parish, Louisiana. Until 1894 title to these lands had been continuously vested in the State of Louisiana. In 1894 and subsequent thereto the state patented these lands to various individuals and petitioner acquired its title from them or their grantees. At the time it took title to the lands petitioner entered thereon and continued in possession thereof. 3. On December 21, 1927, petitioner sold these lands to Samuel George but in the conveyance expressly reserved to itself, its successors and assigns, all of the oil, gas and minerals and mineral rights in the lands. 4. On May 25, 1928, George granted a purported quit claim deed to the oil, gas and minerals in and under said property to one Nigh who thereafter claimed title thereto. 5. On May 28, 1928, petitioner executed a mineral lease to one Harry under the terms of which Harry was granted an exclusive right to explore, drill and mine for oil, gas and sulphur and other minerals on the demised land pursuant to which petitioner reserved certain royalties *46 to itself. 6. On July 10, 1928, Harry sold and assigned a part of his rights under this lease to the Humble Oil & Refining Co. 7. Pursuant to the mineral leases with Harry and Humble Oil & Refining Co. the lessees were required to drill on the property within a specified time but due to the fact that the recording of the deed from George to Nigh placed a cloud on the title of petitioner to the oil, gas and mineral rights petitioner agreed with the lessees that their time to drill on the property should be extended for a period of 30 days after the entry of a decree cancelling the deed from George to Nigh, and declaring petitioner to be the rightful owner of the oil, gas and mineral rights. 8. In November 1928, petitioner instituted an action against George and Nigh in the United States District Court for the Eastern District of Louisiana, in which it was successful and wherein it was decreed that the purported conveyance of the oil, gas and mineral rights from George to Nigh should be cancelled, and petitioner declared to be the rightful owner of the oil, gas and mineral rights. This decree of the District Court was affirmed by the United States Circuit Court of Appeals for the Fifth Circuit on June 29, 1931, , *47 and no appeal was taken therefrom. The status of the ownership of the property at that time was that George or his grantees owned the surface rights and petitioner owned the oil, gas and mineral rights subject to the lease to Harry and the subleases made by him. Since that time petitioner has never claimed any other interest in the property whatsoever except that it has the right, power and privilege reserved in the deed to George to take all the usual, necessary and convenient means for working and taking away the ores, gas, oils and minerals, including the right of access to and the use of such parts of the surface of the land as may be necessary for the mining and taking of the ore, oil, gas and minerals. 9. Subsequently petitioner's lessees drilled for oil on the property, and produced oil in paying quantities for which petitioner received and has continued to receive substantial royalties. Since 1927 the petitioner's sole source of income has been from the mineral leases referred to above. 10. On August 4, 1937, a declaration of heirship of one Cyprien Napoleon Buras, who died about 1888, was placed on record in Plaquemines Parish, La. This declaration of heirship purported *48 to transfer to the heirs of Cyprien Napoleon Buras title to property in Louisiana allegedly owned by him, having been acquired by him by prescription. The property described therein included lands owned by the Buras Levee Board and also the lands as to which petitioner owned the oil, gas and mineral rights. 11. On August 10, 1937, an agreement between the heirs of Cyprien Napoleon Buras, hereinafter referred to as the "Buras Heirs" and LaPlaq Realty, Inc., was recorded pursuant to which LaPlaq Realty, Inc., was employed to appear and act for the Buras Heirs in connection with the prosecution of their alleged claims of ownership of said property. 12. On July 25, 1938, a petition was filed by the Buras Heirs and LaPlaq Realty, Inc., in the Twenty-fifth Judicial Court in and for the Parish of Plaquemines, La., against the Board of Commissioners for the Buras Levee District in which the petitioners prayed, among other things, for a decree of the court declaring them to be the owners of said lands. The land described in the petition of the Buras Heirs in their action against the Board of Commissioners included not only land owned by the Buras Levee Board but also the lands as to which *49 the petitioner is the owner of the oil, gas and mineral rights. Petitioner was not named as a party to the suit by the Buras Heirs nor was petitioner ever served with any process in the action and it never became a party to the action or participated therein. 13. In their petition against the Buras Levee Board the Buras Heirs did not claim record title of any kind, their claim being based exclusively on prescription. 14. The oil companies, which were petitioner's sublessees and which were paying the petitioner royalties in substantial amounts, notified petitioner that a suit had been instituted by the Buras Heirs against the Buras Levee Board and indicated that the monthly royalties might be held up unless the situation was cleared up. 15. It was the view of the officers and directors of petitioner that an action in the Federal District Court in Louisiana brought by petitioner and the oil companies would probably bring a speedier determination of the matter than would be obtained in an action in the state court by the parties in the other suit. 16. Petitioner retained counsel in New Orleans and instituted an action in the United States District Court for the Eastern District of *50 Louisiana against the Buras Heirs and LaPlaq Realty, Inc., praying "That complainants be quieted in their title and possession, and that the alleged adverse claim of defendants thereto, and all persons claiming under them may be removed therefrom, as a cloud upon the title of complainants thereto;" also for a decree declaring petitioner to be the legal owner and possessor of all the oil, gas and mineral rights in that portion of the property formerly owned by petitioner, the surface of which had been sold to George in 1927. 17. During the year 1938 petitioner paid $2,577.60 on account of counsel fees and disbursements in connection with the said litigation and during the year 1939 it paid $19,895.10 in counsel fees and disbursements likewise in connection with the litigation. 18. These amounts were deducted by petitioner in its income tax returns for the respective years 1938 and 1939 as ordinary and necessary business expenses. 19. These deductions were disallowed by the respondent in the determination of the deficiencies for 1938 and 1939 on the theory that they were not ordinary and necessary business expenses but were capital expenditures to be added as additional cost of the *51 land. 20. The action brought by the petitioner against the Buras Heirs and LaPlaq Realty, Inc., was tried in the United States District Court for the Eastern District of Louisiana in January, 1942, and resulted in judgment for the petitioner which was entered on February 12, 1942. No appeal was taken by the defendants and the judgment has now become final. 21. The concluding paragraph of the decree entered by the District Court on February 12, 1942, reads as follows: That that certain written instrument, dated August 10, 1937, and of record in Book 85, folio 51, of the Conveyance Records of the Parish of Plaquemines, Louisiana, is a cloud on the title of plaintiffs and is hereby ordered cancelled as to the property above described, and that plaintiffs be quieted in their title and possession of the property above described, and that defendants, and any and all persons claiming under them, be, and they are hereby, forever and permanently enjoined and restrained from asserting any right, title, interest, claim or demand adverse to, or in conflict with, the rights of plaintiff in and to said property. [Opinion] The Revenue Act of 1938 permits the deduction from gross income *52 of "All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Section 23 (a). Article 24-2 of Regulations 101 provides "The cost of defending or perfecting title to property constitutes a part of the cost of the property and is not a deductible expense." This regulation in the same or substantially the same form has been in all of the regulations promulgated under the internal revenue laws from 1916. The respondent has disallowed the deduction of the amounts here in question under this regulation. The petitioner claims that the amounts constitute an ordinary and necessary expense under the decision of the Circuit Court of Appeals for the Fifth Circuit in . It was there held that attorneys' fees paid by landowners for successful jactitation suits against adverse claimant of mineral rights, instituted by landowners to make realizable income from oil and gas leases executed by the landowner were deductible from gross income as "ordinary and necessary expenses paid * * * in carrying on * * * business." Section 214 (a) (1), Revenue Act of 1921. The court *53 said: * * * To treat as an addition to the cost of land the amount of an expenditure made, after ownership was acquired, to enable the owner, his agent or lessee, to possess and use the land for business purposes, undisturbed by intruders or trespassers, would involve a disregard of the difference between the cost of acquiring ownership of property and expenses paid or incurred to protect the owner's right to undisturbed possession and enjoyment of his property, and what it yields or produces, by himself, his agents or lessees. It seems reasonable to treat amounts expended for services rendered in ejecting or excluding trespassers after ownership has been acquired as expenses incident to the ownership of property and the acquisition and enjoyment of income from it, rather than as additions to the capital investment in the property. * * * In , the court held that attorneys' fees paid by the taxpayer, a lessor of the oil lands, in connection with litigation that arose over his right to receive royalties were in the nature of capital expenditures and were not deductible. In , *54 the question before the Board was whether expenses incurred in a suit to remove a cloud on title to certain land in which the defendant claimed a mineral rights lease given by a taxpayer's predecessor in title, which proved to be a forgery and fraudulently recorded, $ were deductible as ordinary and necessary expenses. The Board held, relying upon , and , affirming , that such amounts were not deductible as ordinary and necessary expenses but that they constituted capital expenditures under the Commissioner's regulations. The Board's decision in that case was affirmed by the , the court saying: Consistently since 1916 the Treasury Regulations have provided that the cost of defending or perfecting title to property constitutes a part of the cost of the property and is not a deductible expense. Congressional approval of this interpretation by reenactment of the applicable revenue statutes in successive acts in identical language *55 gives to the regulation the efficacy of law. Judicial construction of the statute likewise has been in harmony with the regulation. The gist of the decisions in the vast majority of the cases involving the question has been that all sums expended toward the acquisition, protection, or preservation of title to property from or by means of which income is intended to be produced are capital expenditures. We think these authorities truly speak the law, and that the Board of Tax Appeals reached the correct decision when it held this sum to be a capital expenditure and denied the deduction. To the extent, if any, that the decision of this court in , is in conflict herewith, it is overruled. The petitioner stresses the fact that its title to the lands here in question was perfected by the decision of the Circuit Court of Appeals for the Fifth Circuit on June 29, 1931, , and that therefore the subsequent litigation was unnecessary to perfect its title. It is to be observed, however, that the subsequent suit brought by the petitioner *56 against Buras Heirs and LaPlaq Realty, Inc., which was not decided by the court until February, 1942, was for the purpose of "defending or perfecting title to property." We think that the expenses of that suit were clearly within the Commissioner's regulation set out above. Wherefore it is held that the litigation expenses here in question are not legal deductions from the petitioner's gross income for 1938 and 1939. Decision will be entered for the respondent.